# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

## SAVANNAH DIVISION

UNITED STATES OF AMERICA,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀**Case No.  CR 405-59**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MARTIN J. BRADLEY III, *et al*⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀)

## REPORT AND RECOMMENDATION

This RICO[1] prosecution arises from a prescription drug-based fraud scheme advanced in varying degrees by eight individual and two corporate defendants.   The 286-count superseding indictment accuses Martin J. Bradley, III and his father, Martin J. Bradley, Jr., of participating and conspiring with others in racketeering activities that, through the acquisition and marketing of prescription medications, defrauded state Medicaid programs and various pharmaceutical manufacturers, wholesalers, non-profit organizations, and other entities.  Doc. 228.

---

[1]The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, <u>et seq</u>.

All ten defendants have jointly filed a number of motions seeking the dismissal of certain counts of the indictment and the striking of numerous "racketeering acts" charged under Count 1 (the RICO count). Docs. 101, 111, 113, 256, and 257. Additionally, Bradley, III and Bradley, Jr. seek the dismissal of other counts in which they are individually charged. Docs. 93, 115. This Report and Recommendation will address each of those motions.

## I.    Motion to Dismiss Mail and Wire Fraud Counts and Racketeering Acts

All defendants jointly move under Fed. R. Crim. P. 12(b)(2) 12(b)(3)(B) to dismiss the substantive counts and racketeering acts of the indictment charging defendants with either mail or wire fraud. Doc. 101 at 1, 25.[2] At bottom, they contend that because more specific penal statutes fit the alleged crimes, the Court should dismiss charges based on the more

---

[2]More specifically, they want the Court to "(1) dismiss the mail and wire fraud charges in Counts 3(A) and 4-53 of the Indictment and (2) strike from the RICO and RICO conspiracy charges in Counts 1 and 2 the mail and wire fraud racketeering acts 1-29, 35-82 and 172-186." Doc. 101 at 25. The indictment (doc. 1) has since been superseded (doc. 228), shifting some of the numeration defendants reference, but the charges they challenge remain the same.

general mail and wire fraud[3] statutes since Congress, by implication, intended the more specific statutes to control. Doc. 101 at 21 ("Permitting the government to use mail and wire fraud to prosecute Medicaid fraud is improper...."); id. at 25 ("Allowing this mail/wire fraud-based RICO case to go forward would give unscrupulous prosecutors and civil plaintiffs' lawyers licence to interfere with the proper and efficient function of the Medicaid program").

Unsurprisingly, defendants cite no direct authority for the result they urge here. They are correct in pointing out that Congress has enacted statutes which may be said to more tightly fit some if not most of the alleged offenses. See, e.g., United States v. Tarango, 396 F.3d 666, 669 (5th Cir. 2005) (applying 18 U.S.C. § 1347, which proscribes the defraudation of a health care benefit program). But the Eleventh Circuit has routinely upheld the government's application of the "looser" RICO, mail, and wire fraud statutes in Medicare fraud cases even though more specific statutes exist. See, e.g., United States v. Pedrick, 181 F.3d 1264, 1266 (11th Cir. 1999); United States v. Mills, 138 F.3d 928, 941-42 (11th Cir. 1998).

---

[3] 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

It is true that the argument raised here may not have been raised in those Eleventh Circuit cases. And there may be good *legislative* arguments for removing some of the statutory tools from the prosecutor's toolbox. Loosely worded statutes, after all, can easily be misused to "over-federalize" offenses that rightly should be handled by the states,[4] or criminalize mere civil or moral wrongs. See United States v. Brown, 79 F.3d 1550, 1562 (11th Cir. 1996) ("the fraud statutes do not cover all behavior which strays from the ideal; Congress has not yet criminalized all sharp conduct, manipulative acts, or unethical transactions"). For that matter, "generic" fraud and conspiracy statutes have been soundly criticized.[5]

---

[4]As one commentator notes:

The increase in new [federal] legislation, permitting increased federal prosecution, is not the only cause of overfederalization and overcriminalization. There is also legislation that lacks sufficient specificity, allowing prosecutors to use federal statutes to bring conduct that is normally handled by state and local bodies into the federal system.

E.S. Podgor, *Jose Padilla and Martha Stewart: Who Should Be Charged with Criminal Conduct?* 109 Penn St. L. Rev. 1059, 1061 (2005).

[5]"Generic statutes," Podgor argues,

allow federal prosecutors discretion to proceed criminally against conduct that might normally be considered state or local criminal activity. For example, the mail fraud statute, an 1872 federal statute that was focused on re-codifying the Postal Act and criminalizing lottery schemes that used the postal system, allows for federal prosecution of a wide array of conduct. Jed Rakoff, now a federal district court judge, has called the mail fraud

Nevertheless, defendants raise no constitutional challenge, and their

"Stradivarius" arguments are otherwise more properly urged in a

Congressional, rather than a judicial, forum. "Court-imposed limits, such

as those imposed on the mail fraud statute . . . are [simply] not a

commonplace occurrence," 109 Penn.St.L.Rev. at 1063, and that shall

remain true here.  See United States v. Trie, 21 F.Supp.2d 7, 19 (D.D.C.

1998) (Absent evidence that Congress expressly intended to preempt a

general statute with a more specific statutory scheme, the prosecutor has

---

statute the prosecutor's "Stradivarius" or "Colt 45." Schemes to defraud,
whether they involve diet drug fraud, "divorce mill" fraud, or securities
fraud, may lead to charges of mail fraud when there is some mailing, no
matter how "routine" or "innocent" the mailing might be. The Supreme
Court has stated that the mailing does not have to be an essential part of
the scheme to defraud.

Equally permissive is the wire fraud statute, a law that was modeled after
the mail fraud statute, although enacted in 1952. Even when the wire used
as the basis for the prosecution passes from one place within a state to
another place within the same state, wire fraud may be charged if the wire
happened to have passed, unbeknownst to the sender, outside the state.

Prosecutors also have enormous discretion to bring criminal charges for
conspiracy to defraud, which Justice Learned Hand referred to as the
"darling of the modern prosecutor's nursery." Under the generic conspiracy
statute, prosecutors can bring charges of conspiracy to commit a specific
offense or a conspiracy to defraud the government. When conspiracy to
defraud is alleged, there are few restraints on the government's ability to
prosecute. As noted by Professor Abraham Goldstein, "[t]he phrase
[conspiracy to defraud] has had no fixed meaning."

Id. at 1062-63 (footnotes omitted).

the discretion to decide how best to employ the battery of available criminal statutes); <u>United States v. Simon</u>, 510 F.Supp. 232, 236-37 (E.D.Pa. 1981) (There is no firm rule that the government must choose to prosecute under specific rather than general statute; enactment of Medicaid fraud statute did not preempt the use of other federal criminal statutes in prosecution of Medicaid fraud, and such prosecution could proceed on charges of mail fraud and making false statements within jurisdiction of federal agency).[6] The fact that Congress armed prosecutors with both surgical tools *and* meat-axes has not been shown to violate any constitutional minima, and courts are otherwise equipped (<u>e.g.</u>, by addressing various prosecutorial

---

[6]It has been said that "courts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones." <u>Tug Allie-B, Inc. v. United States.</u>, 273 F.3d 936, 941 (11th Cir. 2001). Citing <u>Allie-B</u>, defendants argue for application of that principle here. Doc. 101 at 6.

Yet <u>Allie-B</u> also noted that "a newer statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old that cannot be reconciled." <u>Id</u>. at 941 (alterations, quotes and cite omitted). There is no positive repugnancy between the specific versus more general statutes identified in this case. True, it may be repugnant to some that Congress has provided prosecutors with both surgical tools *and* meat-axes, but positive repugnancy denotes irreconcilable inconsistency, and while one form of implement enables more precision than the other, both enable the same task of excising criminal conduct from society.

misconduct and <u>Brown</u>-type statutory limitation defenses) to rein in meat-ax enabling prosecutorial excesses.

Accordingly, defendants' joint motion to dismiss or strike mail and wire fraud charges  (doc. 101) should be **DENIED**.

## II.   Motion to Dismiss "Stolen Property" Acts

Count 1 (RICO) of the superseding indictment charges defendants with various "racketeering acts," including transporting in interstate commerce fraudulently obtained pharmaceuticals "of an aggregate value of $5,000 or more" in violation of 18 U.S.C. § 2314.  Doc. 228 at 16-17, 27, 30-31, 34-35, 44-45 (identifying a total of 57 separate "racketeering acts" to support the alleged violation of 28 U.S.C. § 2314).  Defendants argue that 11 of those racketeering acts must be dismissed because they do not individually satisfy the $5,000 jurisdictional prerequisite.  Doc. 256 (citing Acts 104, 105, 110, 185, 186, 187, 191, 192, 193, 196, and 199).

Defendants' argument is without merit.  The statute provides in relevant part: "Whoever transports in interstate or foreign commerce any goods . . . of the value of $5,000 or more, knowing the same to have been

stolen, converted, or taken by fraud . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." 18 U.S.C. § 2314. Defendants correctly assert, then, that this section imposes a $5,000 minimum value as a prerequisite. Doc. 256.

They omit, however, the crucial statutory definition of "value." "Value" means "the aggregate value of all goods . . . referred to *in a single indictment*." See 18 U.S.C. §§ 2311 (emphasis added). Here, all 57 acts identified by the government are offered as support for Count One of the indictment against the joint defendants. Doc. 228 at 9-55. Thus, by the plain language of the statute, the values of the 57 separate racketeering acts — all alleged under Count One — may be aggregated to satisfy the $5,000 prerequisite. The aggregated value of the cited acts easily exceeds $5,000; therefore, the fact that some of the acts involved less than $5,000 does not mandate their dismissal.

Defendants cite Brown v. Protective Life Insurance Co., 353 F.3d 405 (5th Cir. 2003), to support their argument that separate acts may not be aggregated under 28 U.S.C. § 2314. Doc. 256 at 2. Brown does not aid the defendants, as that court merely held that it would not *extend* the well-

recognized aggregation rule to civil cases. 353 F.3d at 408. In fact, Brown specifically allowed aggregation in "criminal cases where the separate transactions were substantially related and charged as a single indictment." Id. (citing Schaffer v. United States, 362 U.S. 511, 517 (1960) ("A sensible reading of [28 U.S.C. § 2311] properly attributes to Congress the view that where the shipments have enough relationship so that they may properly be charged as a single offense, their value may be aggregated"); see also United States v. Markus, 555 F.Supp. 375, 377-78 (D.N.J. 1983) (aggregation of value of property within single count is permissible).

Defendants' Joint Motion to Dismiss Certain "Stolen Property" Acts for Failure to State Offenses (doc. 256) therefore must be denied.


## III.  Motion to Dismiss or Strike "Intangible Right" Allegations

Count 1 of the superseding indictment also charges defendants with racketeering acts involving violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Doc. 228. Certain of those charges stem from schemes to defraud entities of money, property, and "the intangible right of honest services." Id. at 27-29, 31-34, 38-41. Defendants insist that

9

these "intangible right" allegations must be dismissed or struck from the indictment because (a) the indictment does not allege a violation of 18 U.S.C. § 1346, from which the "intangible right" phrase is taken; and (b) the indictment does not allege the required fiduciary relationship on which such a charge must be based.  Doc. 257 at 3-7.

Defendants' first argument is completely baseless.  Count 1 of the superseding indictment charges defendants with engaging in racketeering activities involving mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  See, e.g., doc. 228 at 27-29, 31-34, 38-41.  Those statutes make it a crime for an individual, "having devised or intending to devise any scheme or artifice to defraud" another, to use the mail or a wire communication "for the purpose of executing such scheme or artifice . . . ."  See 18 U.S.C. §§ 1341, 1343.

Sections 1341 and 1343 specify clear prohibitions against using the mail or a wire to further a "scheme or artifice to defraud."  Defendants have been properly charged with violations of those sections.  Section 1346, on the other hand, simply defines those statutes' "scheme or artifice to

10

defraud" language to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

Thus, the "intangible right" allegations in the indictment are appropriately stated as a species of the mail/wire fraud charges; to prove a violation of the mail or wire fraud statutes, the government must identify what the victim has been defrauded of, and here the government properly alleges money, property, and the intangible right of honest services. See, e.g., United States v. deVegter, 198 F.3d 1324, 1328 n. 4 (11th Cir. 1999). Indeed, since § 1346 is merely a definitional statute, it would have been improper to charge the defendants with a "violation" of it. See United States v. Ratcliff, 381 F.Supp.2d 537, 550 n. 103 (M.D.La. 2005) ("18 U.S.C. § 1346 does not create a new offense, but only further defines a pre-existing offense") (citing United States v. Hooten, 933 F.2d 293, 297 (5th Cir. 1991)).

The Court must also reject defendants' second argument. Doc. 257 at 3-7. Defendants argue that the intangible right doctrine is only violated where the defendant owed a fiduciary duty to the victim. Id. at 3. Thus, defendants conclude, the intangible right allegations are inappropriate here,

11

where the defendant wholesalers owed no fiduciary duty to the "victims" they were allegedly defrauding.  Id. at 4-5.

To support their argument, defendants rely on United States v. deVegter, 198 F.3d 1324 (11th Cir. 1999).  That court did suggest that the government must show the existence of a fiduciary duty, id. at 1330-31, and the government implicitly concedes that it must do so.  Doc. 269 at 2-3.  Nonetheless, deVegter does not seem to require that defendants be held to the same strict fiduciary duty to which a public official would be held.  Id. at 1327-28.  Recognizing the distinction between public official malfeasance and private sector misconduct, the Eleventh Circuit wrote that  a private-sector defendant's breach of loyalty must merely "contravene—by inherently harming—the purpose of the parties' relationship."  Id. at 1328-29.

Though defendants deny that they owed any sort of fiduciary duty to any group or manufacturer, the deVegter decision actually supports a denial of defendants' motion.  That court held that the intangible right allegations against the defendant were proper where the indictment "implicitly

12

allege[d]" that the defendant breached a fiduciary duty owed to his victim. Id. at 1330.

Similarly, the indictment here allows the Court to infer a breach of fiduciary duty by the defendants. The indictment alleges that defendants—through their corporate ventures—joined the Innovatix and GNYHA group purchasing organizations (GPOs) to purchase pharmaceuticals at the groups' membership prices.   Doc. 228 at 31-34, 38-41.   In doing so, defendants may have taken on duties to act honestly and fairly in their dealings with those GPOs.[7]  See deVegter, 198 F.3d at 1330.  Moreover, defendants' schemes could surely be said to have "contravened" the purpose of their relationships with either those organizations or the drug manufacturers and wholesalers. Id. at 1329.

Thus, defendants' claim that the necessary fiduciary relationship did not exist is not enough to have the intangible right charges dismissed; the government has alleged all of the elements of the offense, so it would not be proper to dismiss the charges based on defendants' denial of some of the facts. See, e.g., deVegter, 198 F.3d at 1326-27 ("[A] court may not dismiss

---

[7]Of course, the government will have to prove the existence of such a duty at trial.

an indictment . . . on a determination of facts that should have been developed at trial") (quotes and cite omitted); see also United States v. Dasilva-Hernandez, 2005 WL 1231714 at *1 (11th Cir. 2005) ("An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy") (quotes and cites omitted)).

Accordingly, defendants' joint motion to dismiss the intangible right allegations must be denied.  Doc. 257.

## IV.   Motion to Dismiss Money Laundering Acts Involving Two Foreign Banks

All defendants have filed a motion to dismiss or strike the money laundering charges asserted in racketeering acts 227, 236, 240, 243, 244, 248 and 249 of the original indictment[8] for failure to state offenses within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i). Doc. 113.  These racketeering acts each assert individual money laundering transactions (involving the

---

[8]The superseding indictment, renumbered these acts as 228, 237, 241, 244, 245, 249, and 250.  The Court will use the new numbering system in its discussions.

proceeds of mail and wire fraud) between two foreign financial institutions in Nassau, Bahamas, where defendants Bradley, III and Bradley, Jr. maintained accounts.[9]  Defendants assert that these "Bahamas-to-Bahamas" transfers "failed to state offenses within the jurisdictional reach of Section 1956 because these specific 'transactions' were entirely outside the United States."  Doc. 113 at 5.

In support of their contention that the money laundering statute does not reach financial transactions occurring between two foreign banks, defendants cite United States v. Kramer, 73 F.3d 1067 (11th Cir.), cert. denied, 519 U.S. 1011 (1996).  In Kramer, the Eleventh Circuit reversed the money laundering conviction of a defendant prosecuted under 18 U.S.C. § 1956(a)(2), citing the United States' lack of jurisdiction to prosecute the

---

[9]The indictment charges that Bradley, III and Bradley, Jr. opened both a bank account and a credit card account in Nassau, Bahamas in the name of one of their many companies, Intermed Pharmaceuticals Supply. Doc. 228 at 9.  Funds in excess of $5 million were deposited into these foreign accounts from various accounts in the United States over which defendants maintained control. Id.  Defendants allegedly used these accounts for their own personal benefit and for the benefit of other members of their scheme.  The racketeering acts challenged by defendants all concern transfers of funds from the Nassau bank account to the Nassau credit card account between June 1998 and June 2000. Id. at 49-52.  Although only the Bradleys are named in these racketeering acts, all defendants seek their dismissal.

defendant for a transaction that occurred entirely between two foreign countries.

Defendants' reliance on Kramer is misplaced, as that case deals with Section 1956(a)(2) instead of Section 1956(a)(1)(B)(i), the subsection of the money laundering statute at issue in this case.   The Eleventh Circuit addressed this statutory distinction in United States v. Tarkoff, 242 F.3d 991 (2001).  The court in Tarkoff concluded that Kramer did not control in the case of a § 1956(a)(1)(B)(i) violation because "violation of the subsection at issue in Kramer specifically requires a transfer of funds to or from the United States . . . whereas a violation of the subsection under which Tarkoff was convicted [§ 1956(a)(1)(B)(i)] can occur so long as the defendant was involved in a 'financial transaction.'"  Id. at 994.

Defendants further argue in their Joint Reply that the Eleventh Circuit's decision in Tarkoff was an anomaly limited to that specific factual situation and should not be extended to this case.  Doc. 216.  The defendant in Tarkoff had demonstrable direct links to the United States while conducting the financial transaction for which he was convicted.   He traveled to Israel from the United States to conduct business at a bank

16

there, and he used telephone communications from Miami to Curacao to effectuate the financial transactions. Id. at 995. Defendants argue that since these types of demonstrable links have not been alleged in the superseding indictment, the racketeering acts should be dismissed for lack of jurisdiction.

Defendants also direct the Court's attention to the provisions of 18 U.S.C. § 1956(f), which clarify the intended jurisdiction of the United States over acts falling under the money laundering statute. In this provision, extraterritorial jurisdiction is limited to situations where the conduct involved a United States citizen and the value of the transaction exceeded $10,000. Defendants assert that §1956(f) does not suggest extension to every case involving United States citizens. They highlight language in a Senate report that gives an example of a person telephoning instructions from the United States to a foreign bank to effectuate a transfer. Defendants conclude that mere involvement of a United States citizen is not enough and that more ties to the United States are necessary than those that have been demonstrated in these financial transactions.

17

Finally, defendants urge upon the Court the legal presumption that statutes should not be applied outside the territory of the United States without manifest Congressional intent. See, e.g., Small v. United States, 125 S.Ct. 1752, 1755 (2005); Smith v. United States, 507 U.S. 197, 204, n. 5 (1993); United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir. 1977). Since Congress has not clearly stated its desire to legislate extraterritorially in every case involving a United States citizen, say defendants, this Court should refrain from allowing the statute's reach to extend to these transactions.

Defendants' Joint Reply arguments are misdirected and must fail as to the challenged racketeering acts. The superseding indictment charges defendants with crimes in the language of the statute and alleges facts which constitute a prosecutable offense. Contrary to defendants' position, § 1956(f) does give extraterritorial application to the money laundering statute, and Congress' intent that there be extraterritorial jurisdiction in certain qualifying situations is clear.

Section 1956(a)(1)(B)(i) makes certain financial transactions crimes. Section 1956(c)(4) defines "financial transaction" as, among other things,

"a transaction which in any way or degree affects interstate or foreign commerce." In this case, the racketeering acts at issue are all alleged to be "financial transactions affecting interstate and foreign commerce." Doc. 228 at 48. Further, the indictment alleges that the transferred funds were derived from "specified unlawful activity, that is, mail fraud and wire fraud," id., and that the source of these funds were "various accounts in the United States over which [defendants] had control." Id. at 9. Specifically, the indictment alleges that the funds deposited in defendants' Bahamian accounts were derived from their Bio-Med accounts in Savannah, Georgia and Miami, Florida. Id. Thus, the Bahamas-to-Bahamas transfers involved funds which had been generated in the United States and, according to the indictment, were designed to disguise and conceal the illegal nature and source of the funds. Id. at 48. This Court is not, at this stage of the proceedings, at liberty to assess the sufficiency of the evidence supporting an indictment obtained from an unbiased grand jury. United States v. Calandra, 414 U.S. 338, 344-45 (1974); Costello v. United States, 350 U.S. 359, 362-62 (1956); United States v. Ayarza-Garcia, 819 F.2d 1043, 1048 (11th Cir. 1997) (superseded by statute on other grounds); United

States v. Brown, 574 F.2d 1274, 1277 (5th Cir. 1978); United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975). To the extent that Tarkoff informs this motion to dismiss, it reinforces the conclusion that a transaction of this sort, between two foreign banks, can under certain circumstances satisfy the requirements of Section 1956(a)(1)(B)(i).

As to the defendants' § 1956(f) argument, a careful reading of the statute reveals that § 1956(f) is a limiting provision. Crimes that satisfy the elements of § 1956(a)(1)(B)(i) must also satisfy § 1956(f), which further narrows the reach of the statute. Section 1956(f) gives extraterritorial jurisdiction over the conduct prohibited in that section if the conduct is by a United States citizen (or if not a citizen, occurs in part in the United States), and the transaction involves an amount exceeding $10,000. By the plain language of the statute, Congress makes clear its desire that crimes which satisfy § 1956(a)(1)(B)(i) be afforded extraterritorial application where the person is a United States citizen and the minimum dollar amount is met. In this case, Bradley, III and Bradley, Jr. are United States citizens,

and the amounts exceeded $10,000 in racketeering acts 228, 237, 241, 244, and 245.[10]

Defendants' Joint Motion to Dismiss or Strike Racketeering Acts 228, 237, 241, 244, 245, 249 and 250 of the superseding indictment must be **DENIED.**

## V.   Motion to Dismiss Mail/Wire Fraud "Diversion" Charges

All ten defendants have jointly filed a motion to dismiss the charges brought against them in racketeering acts 88-100, 115-131, 144-153 and 154-169 of the original indictment for failure to state offenses within the meaning of 18 U.S.C. §§1341 and 1343.  Doc. 111.  The challenged acts relate to the IVIG Safety Net Program, the Innovatix group purchasing organization (GPO), the Puerto Rico scheme, and the Larry Pinkoff scheme, respectively.   The superseding indictment, filed September 20, 2005,

---

[10]The Court notes that racketeering acts 249 and 250 charge financial transactions involving $10,000 and $2,151, respectively. Doc. 228 at 51, 52. Section 1956(f) requires that, for crimes under the money laundering statute, extraterritorial jurisdiction only applies if the amount involved in "the transaction or series of related transactions involves funds or monetary instruments of a value *exceeding* $10,000" (emphasis added). Although the indictment does not allege specifically that racketeering acts 249 and 250 were part of a series of related transactions, this appears to be a fair inference.  And as neither party has raised the jurisdictional amount issue, the Court will not address it further.

renumbered the relevant charges as racketeering acts 88-97, 115-131, 144-153, and 154-169, and added language asserting a scheme to defraud the GPOs and Safety Net Program of not only money and property but also "the intangible right of honest services." Doc. 228 at 28, 31, 39.

The racketeering acts challenged by defendants pertain to various fraudulent schemes to obtain pharmaceuticals at reduced prices based on misrepresentations to manufacturers, wholesalers, group purchasing organizations, and others. The first scheme involved the IVIG Safety Net Program, which was developed through the non-profit Immune Deficiency Foundation. Doc. 228 at 6. The purpose of the program was to provide physicians and pharmacists with an emergency source of intravenous immune globulin (IVIG) when they were unable to obtain it from their regular supplier. Before receiving IVIG, physicians and pharmacists had to affirm that they had no alternative source of IVIG, identify the patient, limit the IVIG received to medically necessary cases, and agree not to re-sell or otherwise distribute the IVIG received. Infustat (one of the companies created and controlled by defendants) allegedly obtained IVIG from the

Safety Net Program through fraudulent misrepresentations, and then diverted the IVIG to Bio-Med where it was sold on the open market. Id.

The second scheme involved Innovatix, a group purchasing organization (GPO) that negotiated discount drug prices for its members. Doc. 228 at 7. Membership was available to "closed pharmacies" that certified that the drugs purchased would only be distributed to the limited patient population serviced by the pharmacy. Infustat, Seratech, and IT were members of Innovatix who allegedly fraudulently misrepresented that the drugs they purchased would be for their "own-use" when, in fact, the drugs obtained through membership in the GPO were diverted to Bio-Med and sold on the open market. Id. at 7-8.

Thirdly, the Puerto Rico Scheme related to the pharmaceutical manufacturers' practice of designating certain amounts of prescription drugs to be sold in Puerto Rico and other Latin American countries at reduced prices. Id. at 8. Manufacturers and wholesale distributors only sell these discounted drugs to entities who agree that the drugs will be distributed in that area and not re-sold in the United States. Allegedly, defendants falsely represented to manufacturers and wholesalers that those

drugs would be distributed only in the designated foreign markets and then unlawfully transported the drugs back to the United States, "diverted" them through several corporate entities, and re-sold them by Bio-Med. Id.

The last scheme involved Larry Pinkoff, an individual who owned and operated several closed pharmacies and pharmaceutical wholesale businesses, including IT, SFP, IVPW, and GIP. Id. at 38. Bradley, III, Bradley, Jr., and Bio-Med are alleged to have fraudulently purchased pharmaceuticals through these entities and re-sold them through Bio-Med on the open market. Id.

Defendants cite the allegations in the superseding indictment that they committed mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 by "breaching" contractual promises (such as "own-use" certifications) and "diverting" pharmaceuticals. They argue that the GPOs and the Safety Net Program could not have been defrauded because they did not lose any "money or property" within the meaning of the mail and wire fraud statutes. Doc. 111 at 6. These entities are said to have "only granted authorizations — in effect, licenses — to buy [pharmaceuticals] at reduced prices based on membership in the organizations obtained through the end-

use certifications." Id. at 10. Defendants conclude that the challenged racketeering acts are not sufficient as to any entity other than the manufacturers. According to defendants, the government has only described the money or property that could have been lost by the *manufacturers*, but not by anyone else. Id. at 5.

In an apparent response to this argument, the government superseded the indictment to charge that defendants schemed to defraud the Safety Net Program and the GPOs of not only "money and property" but also "the intangible right of honest services." Doc. 228 at 28, 31, 39. While defendants have challenged these "intangible right" allegations, the Court has determined that there is no legal basis for dismissing or striking this language from the superseding indictment. See § III, supra. For each group of racketeering acts challenged by defendants, the superseding indictment carefully tracks the language of the statute. An indictment is sufficient if it charges in the language of the statute, United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992), and "a court may not dismiss an indictment . . . on a determination of facts." United States v. deVegter, 198 F.3d 1324, 1326 (11th Cir. 1999). These racketeering acts are legally

sufficient to withstand a motion to dismiss because they charge that defendants devised a scheme and artifice to defraud the group purchasing organizations, the Safety Net Program, and wholesale distributors of money and property and "the intangible right of honest services" in violation of 18 U.S.C. §§ 1341 and 1343. Doc. 228 at 28, 31, 35, 39. Whether, in fact, such losses occurred is a question for the jury to decide.

The Court has also painstakingly reviewed defendants' second argument for dismissal, which states that, as a matter of law, the mail and wire fraud statutes cannot be used to criminalize "breach of contract" claims. Defendants conclude that the alleged diversion schemes constitute only breach of contract and not fraud. Doc. 111 at 11-15. The superseding indictment, however, affirmatively states that there *was* a scheme to defraud—a scheme to obtain goods and services by false and fraudulent pretenses—for each of the racketeering acts at issue here. Doc. 228 at 28, 31, 35, 38-39. This clearly goes beyond alleging only breach of contract, and defendants' argument is contrary to a plain reading of the indictment.[11]

---

[11]As the Court has noted elsewhere, there is an important difference between a (mere) breach of contract — which involves a failure to honor one's promise — and a scheme to defraud — which involves making a promise one intends not to keep. Doc. 296 at 8 (Report and Recommendation addressing defendants' suppression motions). Despite defendants' continued insistence to the contrary, the operative theory of the

Defendants' claims that (1) GPOs and other wholesale distributors were not defrauded because they did not lose any "money or property" and (2) the diversion schemes involved only breach of contract are simply premature. These claims raise triable issues of fact, facts which have been sufficiently alleged in the indictment and which should be determined at trial by a jury. The federal courts may not assess the sufficiency of the evidence supporting an indictment obtained from an unbiased grand jury. United States v. Calandra, 414 U.S. at 344-45; Costello v. United States, 350 U.S. at 362; United States v. Ayarza-Garcia, 819 F.2d at 1048; United States v. Brown, 574 F.2d at 1277; United States v. Mann, 517 F.2d at 267. The Federal Rules of Criminal Procedure permit a defendant to raise prior to trial only those defenses or objections which are capable of determination without the trial of the general issue. Fed. R. Crim. P. 12(b). "It follows that a pretrial motion to dismiss the indictment cannot be based on a sufficiency of the evidence argument because such an argument raises

---

government's case is *fraud*, not breach of contract. That is what the indictment alleges, and that is the case that must be tried. At this point, the Court is not empowered to peek behind the probable cause findings of the grand jury to see if the alleged facts have any merit.

factual questions embraced in the general issue." <u>Ayarza-Garcia</u>, 819 F.2d at 1048.

While this court may review the *legal* sufficiency of the indictment, it may not  (at this stage) review the sufficiency of the proof that will be offered in support of the indictment's allegations, or second-guess the grand jury's probable cause findings.[12]  <u>United States v. Salman</u>, 378 F.3d 1266, 1268-69 (11th Cir. 2004). "It is not for the courts to filter which criminal cases may reach the trial stage by reviewing the proffered evidence in advance." <u>Id.</u> at 1269.

In sum, defendants' motion to dismiss asks the Court to reach legal conclusions based on their version of the facts.  "There is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." <u>Critzer</u>, 951 F.2d at 307. Because the indictment in this case charges in the language of the statute, alleging the required elements of the crime, it is legally sufficient to call for a trial on the merits.  "A motion for acquittal under Rule 29 is the proper

---

[12]<u>See also</u>, <u>Mann</u>, 517 F.2d at 267 ("A defendant may not properly challenge an indictment . . . on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits.").

avenue for contesting the sufficiency of the evidence in criminal cases."
Salman, 378 F.3d at 1268. Should the government fail to meet its burden
at trial of showing that the GPOs and others were defrauded of goods and
services, or that the diversion schemes involved more than breach of
contract, the defendants can at that time move for a judgment of acquittal
as to those offenses under Federal Rule of Criminal Procedure 29.


## VI.    Bradley, III's Motion to Dismiss Count 284

Defendant Martin J. Bradley, III has filed a motion to dismiss the
charges brought against him in Counts 284 and 285 of the original
indictment.   Doc. 93.   These Counts charge defendant with failing to
disclose on the relevant tax forms his interests in foreign bank accounts for
the years 1999 and 2000, respectively.  The superseding indictment, filed
September 20, 2005, did not include former Count 285 but retained and left
unchanged Count 284. Doc. 228 at 80. Therefore, defendant's motion with
respect to Count 285 of the original indictment is moot, and the Court will
address defendant's motion to dismiss Count 284.

Defendant asserts that venue does not exist in the Southern District of Georgia for Count 284, which charges him with failing to disclose a financial interest in certain Bahamian bank accounts.  Doc. 228 at 9, 80. Defendant's federal income tax return for 1999 was prepared by defendant Sara Griffin in Savannah, Georgia on or about October 3, 2001.  The return was signed by Bradley, III on or about October 5, 2001 and was received in the Atlanta, Georgia IRS Service Center on October 9, 2001.  Bradley answered "no" to Question 7a on Schedule B, Part III, which asks, "At any time during 1999, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?".  Doc 233 at 3. Furthermore, defendant never filed Form 90-22.1 for the 1999 tax year, which is the tax form required to be filed for individuals holding certain financial interests in foreign accounts who answered "yes" to Question 7a on Schedule B, Part III.

An indictment or counts of an indictment may be dismissed under Fed. R. Crim. P. 12(b) if "'there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of

facts . . .."'" United States v. deVegter, 198 F.3d at 1326 (quoting United States v. Torkington, 812 F.2d at 1354). To determine the sufficiency of an indictment, a court must only look to the face of the indictment and may not second-guess the facts that the government contends that it can prove at trial. United States v. Critzer, 951 F.2d at 307.

Defendant argues that venue does not exist in the Southern District of Georgia for the government's claim that he failed to file Form 90-22.1 in violation of 31 U.S.C. §§ 5314 and 5322(b), which would have indicated that he had financial interests in foreign bank accounts. Defendant states that it is a "well established rule" that venue in cases involving the failure to file tax forms is found in either (1) the Internal Revenue district where defendant resides, or (2) the district where the Secretary of the Treasury designates that the form in question must be filed. Defendant points out that at all relevant times he has resided in Miami, Florida. Furthermore, Form 90-22.1, the reporting form that defendant failed to file, directs that it be filed with the Department of the Treasury in Detroit, Michigan. Therefore, defendant concludes, the Southern District of Georgia lacks venue to hear this claim against him.

Venue is proper in this case for two reasons.  First, venue is proper in the district where the incomplete, and partially false, tax return was made and subscribed.  Second, venue is proper at the collection point where the missing form should have been filed.

In determining permissible venue, an early Fifth Circuit[13] case involving prosecution for filing a false income tax return found venue to be proper in the district where the return was made and subscribed, as well as in the district where the return was filed.  United States v. Lawhon, 499 F.2d 352 (5th Cir. 1974) (citing United States v. Hagan, 306 F.Supp. 620 (D. Md. 1969)).  Lawhon, while only dealing with the filing of a false return and not the failure to file a mandated tax form, still instructs this Court on notions of proper venue in income tax cases.  The former Fifth Circuit clearly found the location of preparation to be a solid venue choice for prosecution.  In this case, it is contended that defendant's 1999 tax return was prepared by defendant Sara Griffin in Savannah, Georgia.  If defendant

---

[13]Fifth Circuit cases decided prior to October 1, 1981 are binding on this Court because of Georgia's inclusion in the Fifth Circuit until that time.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent decisions of the Fifth Circuit rendered prior to Oct. 1, 1981).

had filed Form 90-22.1, it presumably would have been prepared in Savannah as well.

Secondly, proper venue must be determined from the nature of the crime and the location of the act (or omission) constituting the crime. United States v. Cabrales, 524 U.S. 1, 6-7 (1998). In United States v. Clinton, 574 F.2d 464 (9th Cir. 1978), the Ninth Circuit dealt squarely with the issue of permissible venue in a criminal case where the defendant had failed to file certain income tax forms. The court found that "[f]ailure to file a tax return is an offense either at the defendant's place of residence, or at the collection point where the return should have been filed." Id. at 465. The location where Form 90-22.1 should have been filed is indicated in the instructions on the form itself. Defendant points out that those instructions direct that the form be filed with the Department of Treasury in Detroit, Michigan. However, defendant fails to note the second half of the filing instructions on Form 90-22.1, which add that alternatively, "it may be hand carried to any local office of the Internal Revenue Service for forwarding to the Department of the Treasury, Detroit, Michigan."

Defendant or his agent could easily have hand carried Form 90-22.1 to the local IRS office in Savannah, Georgia. It was a designated place authorized to receive this form for forwarding to Detroit. Moreover, defendant's tax return for the year 1999 was prepared by defendant Sara Griffin in Savannah. It was then signed a few days later by defendant Bradley, III in an unspecified location and mailed to the IRS Service Center in Atlanta, Georgia. The failure to file is clearly connected to the Southern District of Georgia. Because the Southern District of Georgia is one of the districts where defendant's Form 90-22.1 could have, or should have, been filed and the pertinent actions are closely tied to this district, venue requirements are satisfied in this case. See United States v. Clines, 958 F.2d 578 (4th Cir. 1992).

Furthermore, venue in this case satisfies the requirements of the Constitution that the accused have the right to be tried in the district where the crime was committed. Prosecution of this crime in Savannah does not present unfairness or hardship to defendant by forcing him to defend himself in a remote or unrelated place. In Clines, the court dealt with an almost identical scenario involving the failure to file Form 90-22.1.

34

The court found that venue properly lay in the District of Maryland because Cline's accountant had offices in Maryland where he had prepared Cline's income tax returns for the relevant years. Id. at 584. The Court finds that venue properly lies in the Southern District of Georgia based on the language of Form 90-22.1 and defendant's connections to Savannah in relation to this crime.

Based upon the foregoing, the Court recommends that defendant's Motion to Dismiss Count 284 of the Superseding Indictment be **DENIED**.

## VII.  Motion to Dismiss Counts 285 and 286

The superseding indictment also charges defendant Martin J. Bradley, Jr. with two counts of violating 31 U.S.C. §§ 5314 and 5322(b).[14] Doc. 228 at 80-81.[15] Section 5314 makes it a crime for an individual to fail to disclose foreign financial interests in accordance with regulations set out by the Treasury Secretary.  The indictment alleges that Bradley violated that statute by failing to disclose interests in a bank account and credit card in

---

[14]31 U.S.C. § 5322(b) is a sentencing statute related to 31 U.S.C. § 5314.

[15]These counts were originally Counts 286 and 287.  Doc. 1 at 80-81.  They were renumbered as Counts 285 and 286 in the superseding indictment.  Doc. 228 at 80-81.

Nassau, Bahamas, as well as a bank account in Belize, on his 1999 and 2000 tax returns.  Doc. 228 at 9, 80-81.

Bradley argues that these counts must be dismissed because: (1) they do not allege offenses with sufficient particularity, as they fail to specify on which foreign account the alleged violation is based; and (2) the Congressional delegation of authority in 31 U.S.C. § 5314 to the Treasury Secretary is unconstitutional.  Doc. 115.  Both arguments are unavailing.

In his first argument, Bradley claims—without citing any case, regulation, or statute—that these two counts must be dismissed because they do not identify whether the alleged violations are based on his failure to report his Nassau bank account, his Nassau credit card, or his Belize bank account.  Doc. 115 at 2-3.  This argument ignores the indictment's suggestion that the alleged violation of 31 U.S.C. § 5314 refers to Bradley's failure to report *all three* of his foreign accounts.  See doc. 228 at 80-81.

Indeed, Count 285 alleges that, for the calendar year 1999, Bradley had an interest in foreign accounts having "an *aggregate value* of over $2,000,000."  Id. at 80 (emphasis added).  Count 286 alleges, similarly, that in 2000 Bradley Jr. held an interest in foreign accounts having "an

36

aggregate value of over $800,000." Id. at 81. By referencing paragraphs 1-39 of the indictment — which list Bradley's three foreign accounts — the indictment gives Bradley notice that he should prepare a defense against the charges as to each of his foreign accounts.

Moreover, there is nothing that requires the government to state exactly which accounts form the basis for the charge; nor does defendant cite any legal authority for that requirement. "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. U.S., 418 U.S. 87, 117 (1974); see also United States v. Dasilva-Hernandez, 2005 WL 1231714 at *1 (11th Cir. 5/2/05) (unpublished). The standard for the sufficiency of an indictment is not a rigorous one, and the indictment here surely satisfies it.

Second, Bradley argues that the charge alleged under 31 U.S.C. § 5314 must be dismissed because that statute involves an unconstitutional delegation of Congressional authority to the Treasury Secretary. Doc. 115

at 4. Bradley admits that successful challenges on this basis are "exceedingly rare." Id. at 5.

This Court finds nothing so exceptional in 31 U.S.C. § 5314 to constitute that rare instance in American history where Congress has unconstitutionally delegated its authority. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ." U.S. Const., art. I, § 1. Because the legislative power has been specifically granted to it, "Congress may not constitutionally delegate its legislative power to another branch of government." United States v. Mills, 817 F.Supp. 1546, 1552 (N.D.Fla. 1993) (citation omitted).

Nonetheless, courts have long allowed Congress to delegate some legislative power to other agencies, so long as Congress offers them guidelines by which to enact that legislation. See, e.g., Mistretta v. United States, 488 U.S. 361, 373 (1989) (noting that "Congress simply cannot do its job absent an ability to delegate power under broad general directives"); Mills, 817 F.Supp. at 1552-53. Under Mistretta, a delegation of legislative power is constitutionally sufficient if Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of

this delegated authority."  488 U.S. at 372-73 (citation omitted); see also

United States v. Brown, 364 F.3d 1266, 1270-71 (11th Cir. 2004).

In 31 U.S.C. § 5314 — the statute at issue here — Congress began by

stating the general policy: "[T]o avoid impeding or controlling the export or

import of monetary instruments and . . . to avoid burdening unreasonably

a person making a transaction with a foreign financial agency . . . ."

Congress then provided that "the Secretary of the Treasury shall require

[U.S. individuals] to keep records, file reports, or keep records and file

reports, when the [individual] makes a transaction or maintains a relation

for any person with a foreign financial agency."  Id. § 5314(a).

Section 5314(a) also specifies certain information to be required in

those reports, adding that it should be reported "in the way and to the

extent the Secretary prescribes."  Finally, the statute allows the Secretary

to exempt certain persons, accounts in certain countries, or certain sizes and

types of transactions from the requirements.  Id. § 5314(b).

The plain language of 31 U.S.C. § 5314 easily satisfies the Mistretta

standard.  The first clause states the general policy for the provision and

specifies the person—the Secretary of the Treasury—who is to implement

the statute. See § 5314(a). The rest of the statute clearly sets out the boundaries of the delegation, as the Treasury Secretary is empowered only to require reports related to foreign financial transactions. Id. Moreover, the statute identifies the specific information that the reports must contain and provides for specific exemptions from the reporting requirement that the Secretary may prescribe. Id. § 5314(b). Under the well-established case law and the plain language of the statute, 31 U.S.C. § 5314 is not that exceptionally rare statute in which Congress has made an unconstitutional delegation of authority.

More interestingly, Bradley argues that the Treasury Secretary's *re-delegation* of the authority to enforce the provisions of 31 U.S.C. § 5314 is unconstitutional. Doc. 115 at 5-7. The Treasury Secretary, promulgating regulations under the statute, requires individuals to report foreign financial interests "to the Commissioner of Internal Revenue." 31 C.F.R. § 103.24. The Secretary also expressly redelegated the authority to enforce the statute to the Commissioner of Internal Revenue. 31 C.F.R. § 103.56(g). Bradley submits that this redelegation violates Mistretta's requirement that the

Congressional delegation specify the public agency empowered to implement the statute. See Mistretta, 488 U.S. at 372-73.

This argument, too, must fail. First, other than Bradley's speculation that this redelegation violates the Mistretta standard, he offers no argument or citation of authority to support his claim, apparently in the hope that this Court will find some authority for him. This Court will not do the work of the advocate. See L.R. CR.P. 12.1 ("[E]very motion filed in a criminal proceeding shall be accompanied by a memorandum of law citing supporting authorities).

Beyond that failure, though, this type of redelegation is simply not unconstitutional. The statute itself contemplates that the Treasury Secretary might enlist other agencies, as it allows the Secretary to prescribe "other matters [he] considers necessary to carry out this section or a regulation under this section." 31 U.S.C. § 5314(b)(5). Additionally, federal courts have consistently rejected such "redelegation" challenges. See, e.g., United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir. 1999) (upholding a redelegation from Secretary of the Interior to Commissioner of Indian Affairs, who also redelegated his authority to Bureau of Indian Affairs Area

Directors); Hall v. Marshall, 476 F.Supp. 262, 272 (E.D.Pa. 1979) (noting that Secretary of Labor, as head of an executive department, had "general power of delegation" under 5 U.S.C. § 301, and adding that policy concerns point "in the direction of more, not less, delegation"); United States v. McDonald Chevrolet & Oldsmobile, Inc., 514 F.Supp. 83, 87 (N.D.Ga. 1981) ("In an age when practical necessities demand delegation . . ."); United States v. Bareno, 50 F.Supp. 520, 527-28 (D.Md. 1943) ("Heads of Government departments and boards must act . . . in the performance of their routine business. It is impossible for them to do otherwise and dispose of the large volume of work"). The Court cannot accept Bradley, Jr.'s argument that the Treasury Secretary's redelegation was unconstitutional.

Defendant Martin J. Bradley Jr.'s motion to dismiss Counts 285 and 286 (Failure to Disclose Foreign Financial Interests) should be **DENIED**. Doc. 115.

## CONCLUSION

The Court finds no merit to the motions to dismiss jointly filed by all ten defendants in this case (docs. 101, 256, 257, 113, 111) or the individual

motions filed by Bradley, III (doc. 93) and Bradley, Jr. (doc. 115).

Accordingly, each of these motions should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this _15th_ day of

**December, 2005.**


_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA